UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

KEVIN CRUZ

No. 23 CR 305

Judge Steven C. Seeger

### GOVERNMENT'S SENTENCING MEMORANDUM

Over the course of more than a year, and in violation of a state court restraining order, defendant Kevin Cruz engaged in a terrifying course of harassing and intimidating conduct directed toward Victim-1. In short, defendant turned Victim-1's life into a nightmare. Simply because Victim-1 rejected defendant's romantic advances, defendant sent thousands of harassing text messages to Victim-1 and his family; he sent nude photographs of Victim-1 to members of his family; and he created impersonating profiles in which he pretended to be Victim-1 and arranged for random individuals to travel to Victim-1's residences purportedly for sexual encounters. As a result, hundreds of men arrived on Victim-1's doorstep. In some instances, defendant directed those men to forcibly enter Victim-1's house, and if Victim-1 resisted, to rape Victim-1.

Victim-1 powerfully described the effect of defendant's sustained harassment campaign in his victim impact statement:[1]

> My overall spirit still feels completely shattered because of the defendant's actions. I have never been or felt so dehumanized or disrespected by anyone in my entire life. .

---

[1] Victim-1's victim impact statement is attached hereto as Exhibit A. Victim-1's name has been redacted from Exhibit A.

> . . I could not concentrate. I could not sleep. I could not
> eat. I lost a significant amount of weight in a short period
> of time. I could barely function on a day to day basis, which
> made it very difficult for me to work, engage in self care, or
> socialize. I was in a constant state of panic. I get chills in
> my body when I think about this time period, because it
> was so hard to live through.

Even after he was arrested, defendant was not deterred from continuing to attempt to harass Victim-1. While detained at MCC-Chicago, defendant placed numerous outgoing calls to Victim-1 and sent threatening letters to defendant's now ex-husband.

Moreover, this is not the first time that defendant has engaged in similar conduct. Defendant was arrested in Dane County, Wisconsin for harassing another individual; and in Cook County, another person obtained a no-contact order after defendant engaged in what was described as "multiyear harassment." For these reasons, the government respectfully requests that the Court impose a sentence at the top of the guidelines of 51 months' imprisonment.

### BACKGROUND AND OFFENSE CONDUCT[2]

On June 21, 2024, defendant Kevin Cruz pled guilty to the sole count of the indictment, which charged him with cyberstalking in violation of 18 U.S.C. §

---

[2] The information in this section is derived from the evidence presented at trial, the PSR and other materials provided to the Probation Department in connection with the preparation of the PSR. At sentencing, a district court may rely upon information contained in a PSR as long as the information is well supported and appears reliable. *United States v. Salinas*, 365 F.3d 582, 587 (7th Cir. 2004).

2261A(2). Below, the government summarizes the campaign of harassment that defendant conducted against Victim-1, as well as other factual information relevant to defendant's sentencing.

**I.    Defendant Engaged in a Campaign of Harassment Against Victim-1**

Defendant and Victim-1 first met over Grindr, a social messaging and dating application, in August 2021. At the time, they discussed the possibility of a sexual relationship, although ultimately Victim-1 was not interested. PSR ¶ 7. Defendant was upset that his romantic overtures were rebuffed, and began to harass Victim-1.

In December 2021, defendant created a fake profile on Grindr purporting to be Victim-1 soliciting sex. That profile included near-nude photographs of Victim-1 that he had shared with defendant earlier that year. After discovering the profile, Victim-1 terminated communications with defendant and stopped responding to his text messages. Defendant then began sending threatening text messages to Victim-1. PSR ¶ 8. As Victim-1 described, "[M]yself, my family, my friends and my employers received sexually explicit and threatening messages and photos from the defendant on almost a daily basis. These messages included threats of killing and raping my mother and physical threats of my two-year-old niece. I received messages of threats of sending ex-convicts and convicts to my home. . . . These actions truly made me fear for myself and my family's life." (Exh. A, at 2.)

Defendant also sent nude photographs of Victim-1 and other sexually explicit content to members of Victim-1's family, including to Victim-1's mother, brother,

3

cousins, aunts, and others. PSR ¶ 11. For instance, in March 2022, defendant sent nude photographs of Victim-1 to his mother. In April 2022, defendant sent a text message to Victim-1's mother containing a pornographic screenshot showing an individual performing oral sex. Defendant told Victim-1's mother that the screenshot came from her son's OnlyFans video. Additionally, defendant sent a message that same month falsely informing Victim-1's mother that Victim-1 had committed suicide. Defendant texted, "holy fuck [Victim-1] rly killed him. Just posted on blog hanging himself and taking meds. [Victim-1] rly did it. U got u wanted. U killed tat f[**] 5 police cars and ambulance to take his body." Victim-1 described the effect this had on him: "When the defendant sent private photos of myself to my mother, brothers, employers, and friends, I felt extremely violated and depressed." (Exh. A at 1.)

Additionally, defendant created numerous impersonating profiles on various dating websites. Some of those included Victim-1's full name and home address. As a result of these profiles, between December 2021 and April 2021, defendant sent hundreds of men to Victim-1's residence looking for sex or sexual favors. Victim-1 spoke to some of those people, some of whom said that they were instructed to show up at Victim-1's residence and enter without knocking. Further, they were told that if Victim-1 told them to stop, it was part of role playing and to continue to try to have sex with Victim-1 against his will. PSR ¶ 9.

As a result, Victim-1 moved out of his residence and moved in with his parents

in another suburb of Chicago. Even after the move, defendant continued to create impersonating profiles and to send men to Victim-1's parent's residence under pretenses of engaging in sex with Victim-1. Some of these people were also instructed to enter the residence unannounced, and that if Victim-1 appeared to resist sex, it was part of role playing. PSR ¶ 10.

Victim-1 described: "This individual distributed mine and my family's address online, and sent approximately a total of 1000 different strangers to our home. . . . Some of these strangers were invited and instructed by the defendant to break into our home. Due to this, my family and I dealt with many sleepless and scary nights, and time spent having to interact with law enforcement with every single person that showed up to our door." (Exh. A at 2.)

As a result of defendant's conduct, Victim-1 obtained a no contact order from Cook County Circuit Court, which prohibited defendant from contacting Victim-1 or from disseminating photographs of Victim-1. PSR ¶ 16. The no contact order did not abate defendant's harassment, and if anything, the behavior continued to escalate.

## II.   <u>Defendant Harassed Employees at his and Victim-1's Employer</u>

While he was harassing Victim-1, defendant also stalked employees at a local hospital, where both Victim-1 and defendant worked. The hospital initiated an internal investigation into defendant's harassment of Victim-1, during which defendant admitted to creating impersonating social media profiles. Defendant's employment at the hospital was terminated.

5

However, afterwards, defendant began sending harassing messages to the hospital employee who conducted the internal investigation. Defendant also sent concerning messages to a different hospital employees. Fearing that the conduct would escalate, members of the hospital obtained a no-contact order. PSR ¶ 14-15.

## III. Defendant's Harassment Escalated after April 2023

In April 2023, in consultation with the Federal Bureau of Investigation ("FBI"), Victim-1 contacted defendant for an in-person meeting, which occurred in a public location on May 5, 2023. During the meeting, defendant admitted to harassing Victim-1 and his family, including sending text messages to Victim-1's mother telling her that she would be raped. PSR ¶ 18. Defendant also admitted to carving the word "ho" in Victim-1's vehicle. At the end of the meeting, Victim-1 went to his vehicle in the parking lot, but defendant blocked him from getting into his car. As a result of the potentially dangerous situation, members of law enforcement arrived. Defendant went to his vehicle and refused to provide his name or any additional information. PSR ¶ 18.

Notably, after the meeting, defendant escalated his harassment. He sent numerous unwanted food items, flowers, and gifts to Victim-1's residence, including a flower delivery that included a link to a disturbing video message from defendant. PSR ¶ 19. In May 2023, defendant sent a text message to Victim-1 stating that defendant had driven by Victim-1's house. Later in May, defendant traveled to a gym where Victim-1 worked, where he put a note on the windshield of Victim-1's vehicle.

On May 16, 2023, FBI agents attempted to execute an arrest warrant for defendant at his residence. When they entered, defendant barricaded himself in the basement of his residence with an aggressive pit bull. While he was barricaded, defendant texted Victim-1 accusing him of sending the FBI to defendant's house. Ultimately, FBI agents spoke to one of defendant's attorneys, who convinced him to surrender. Even after his arrest, however, defendant was belligerent with agents, including claiming that they would "rape" him.

## IV.    Defendant's Arrest Did Not Stop his Harassment

Defendant's federal arrest and detention at MCC-Chicago did not deter his efforts to harass Victim-1 and others. While there, defendant placed hundreds of calls to Victim-1's phone. PSR ¶ 21. Indeed, the government moved for an order prohibiting defendant from contacting Victim-1 (Rec. Doc. 32,) which the Court granted on October 30, 2023. In its order, the Court noted, "Defendant Cruz is charged with cyberstalking, and allegedly attempted to place outgoing calls to a telephone utilized by Victim 1. That's a bad look." (Rec. Doc. 33.)

Moreover, while at MCC-Chicago, defendant attempted to send a letter to his now-ex husband, with whom he was involved in a divorce proceeding. PSR ¶ 21. Toward the end of the letter, defendant threatened to report his then-husband to the "FBI for writing prescriptions for people you don't even treat" in retaliation for initiating the divorce proceeding. Additionally, defendant wrote, "Don't worry, your lawyer is going to get what's coming to her too : )." *Id.*

7

**V.**    **Defendant's Prior Harassment of Other Victims**

Defendant has a history of engaging in similar conduct. In December 2017, defendant was arrested by the Dane County Sheriff's Office, Dane County, Wisconsin, and was charged with, among other offenses, misappropriating identity information, in violation of Section 943.201(2) of the Criminal Code of Wisconsin, and unlawful use of computerized communication systems, in violation of Section 947.0125(2)(d) of the Criminal Code of Wisconsin. The case was ultimately dismissed after defendant completed a deferred prosecution/first offender program. Police reports from the Dane County Sheriff's Office, redacted copies of which were attached to the government's memorandum in support of detention (Rec. Doc. 14, at Exh. A), revealed that defendant engaged in a course of conduct against a victim, identified herein as Individual-1, that is strikingly similar to the charged conduct here. There, defendant met Individual-1, a resident of Wisconsin who worked for a state government agency, on a dating website and went on a number of dates. Individual-1 wanted to end the relationship, which he described as non-exclusive. Over the next few months, defendant sent text messages to Individual-1, including where defendant would "make up random phone numbers." (*Id.* at 3.) Defendant also contacted Individual-1 at his state-issued work email, and later created accounts at different dating websites using Individual-1's email address. (*Id.* at 4.) Defendant also created an impersonating Craigslist ad utilizing Individual-1's work email address, which

solicited sex. Individual-1 reported that as a result, he received a number of emails from unknown men inquiring about sex. (*Id.* at 4-5.)

When he was interviewed by law enforcement about this conduct, defendant admitted that he created the fake Craigslist ad because he was angry at Individual-1, (*id.* at 12) and also that he contacted Individual-1 using an "App to change his number in the past to text [Individual-1]." (*Id.*) Defendant also admitted that he utilized Individual-1's email address to create accounts at various dating websites because he was angry at Individual-1. (*Id.*)

On June 23, 2011, an individual referred to herein as Individual-2, filed a petition for a stalking no contact order against defendant in the Circuit Court of Cook County, under case number 2011OP74390. Court records, redacted copies of which were attached to the government's memorandum in support of detention as Exhibit B, revealed that defendant conducted a "multi-year harassment" of Individual-2, which included "literally hundreds of emails, text messages and phone calls" to Individual-2. (Rec. Doc. 14 at Exh. B.) Defendant also attempted to contact Individual-2 at a local high school where Individual-2 worked. (*Id.*) Furthermore, defendant also contacted Individual-2's family members, his girlfriend and her family members with "repeated phone calls and text messages." (*Id.* at 8.) According to Individual-2, the threats made to his girlfriend's sister, who was then a student at the University of Iowa, "resulted in a partial lock down of the campus." (*Id.*) On July 14, 2011, the Circuit Court granted the emergency stalking no contact order, which

9

prohibited defendant from contacting Individual-2 for a period of two years. (*Id.* at 3-4.) Defendant apparently violated the order by repeatedly contacting Individual-2 and his attorney. (*Id.* at 10.) Ultimately, on July 31, 2013, the court issued a plenary stalking no contact order prohibiting defendant from contacting Individual-2 and others for another year. (*Id.* at 5-6.)

**GUIDELINES CALCULATIONS**

The government disagrees with the Guidelines calculation in the Presentence Investigation Report ("PSR") submitted by the United States Probation Office ("Probation"). The government concurs that the base offense level is 18, pursuant to U.S.S.G. § 2A6.2. Additionally, four levels are added because defendant's conduct involved violation of a court order and a pattern of activity involving stalking the same victim. As described in more detail below, the government objects to the PSR's conclusion that defendant has accepted responsibility.

## I.   Defendant Has Not Accepted Responsibility

The government respectfully objects to the PSR's conclusion that defendant has accepted responsibility and to the application of a three-level reduction.[3] Pursuant to U.S.S.G. § 3E1.1, if the defendant "clearly demonstrates acceptance of responsibility for his offense," the offense level is reduced by two levels. The

---

[3] Should the Court overrule the government's objection, and should it apply the two-level reduction pursuant to U.S.S.G. § 3E1.1, the government agrees that defendant's guilty plea was timely and that defendant would be entitled to one additional level reduction pursuant to U.S.S.G. § 3E1.1(b).

application notes outline a list of non-exhaustive factors that should be considered in determining whether the reduction applies, including "voluntary termination or withdrawal from criminal conduct or associations." U.S.S.G. § 3E1.1, Application Note 1(A). Moreover, although entry of a guilty plea "prior to the commencement of trial . . . will constitute significant evidence of acceptance of responsibility . . . such evidence may be outweighed by the conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id.* at Application Note. 3. "A defendant who enters a guilty plea is not entitled to an adjustment . . . as a matter of right." *Id.*

Indeed, Courts in the Seventh Circuit have denied acceptance of responsibility reductions where the defendant continued to commit criminal conduct after arrest, particularly in cases where the continued criminal conduct was similar to the charged offense. *See, e.g.*, *United States v. Panadero*, 7 F.3d 691 (7th Cir. 1993) (in fraud case denying acceptance where defendant engaged in bank fraud while released on bond); *see also United States v. McDonald*, 22 F3d 139, 144 (7th Cir. 1994) (district courts may consider not only similar criminal conduct to the charged offense, but any conduct bearing on whether the defendant acted in a manner consistent with acceptance). Further, courts have held that post-arrest harassment or stalking is a basis to withhold acceptance of responsibility. *See United States v. Cummings*, 259 Fed. App'x 446, 448 (3d Cir. 2007) (post-arrest harassment while on pretrial release supported that defendant was not entitled to acceptance of responsibility reduction); *United States v. Hutterer*, 706 F.3d 921, 926 (8th Cir. 2013) (in interstate threat case,

defendant was not entitled to acceptance where she sent threatening letters to FBI agent); *United States v. Robinson*, 370 F.Supp.2d 331, 335-36 (D. Maine 2005) (in interstate violation of protective order case, denying acceptance of responsibility where defendant continued to violate protective order after arrest).

Here, after defendant was arrested and detained at MCC-Chicago, defendant placed hundreds of calls to Victim-1 --- in other words, defendant continued attempting to harass Victim-1 even after he was charged. Moreover, defendant's attempts to contact Victim-1 were in violation of the still-effective no contact order in Cook County, which prohibited defendant from contacting Victim-1 in any way. Defendant also attempted to send a threatening letter to his ex-husband in retaliation for the ex-husband initiating divorce proceedings. Indeed, defendant threatened to report his ex-husband to the FBI for purportedly writing fake prescriptions. Moreover, defendant wrote that his ex-husband's lawyer was "going to get what's coming to her too" followed by a smiley face.

Defendant's post-arrest conduct demonstrated that he did not voluntarily terminate or withdraw from criminal conduct --- if anything, he continued the same course of conduct that he had engaged in for more than a year prior to his arrest. Under these circumstances, defendant's post-arrest conduct was inconsistent with a demonstration of remorse or acceptance of responsibility.

## II. <u>Criminal History</u>

The government agrees with the PSR's conclusion that defendant's criminal

history category is I.

## III.    **Guidelines Range**

Defendant's guidelines range is 41 to 51 months' imprisonment based on a total offense level of 22 combined with criminal history category I.  Defendant also faces a mandatory minimum sentence of 1 year imprisonment.

## SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.   In order to determine the sentence to impose, the Court must consider the statutory factors listed in § 3553(a)(1)-(7).[4]   One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Sentencing Commission's policy statements. Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).  For the reasons set forth below, consideration of the § 3553(a) factors reflect that a sentence at the top of the advisory guidelines range of 51 months' imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing.

---

[4] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

## I.   Nature and Circumstances of the Offense

The nature and circumstances of the offense are serious and warrant a significant sentence of imprisonment.  As described by Victim-1, the emotional harm that defendant inflicted during the more than one year that defendant cyberstalked Victim-1 was severe and long-lasting.  Defendant's conduct shocks the conscience, and he created significant risks that Victim-1 would be hurt, injured, and raped. Moreover, defendant's conduct escalated from harassing text messages, to non-consensual dissemination of private photographs of Victim-1 to Victim-1's family, to creation of impersonating dating profiles and sending men seeking sexual encounters at Victim-1's home.  Defendant's obsession with Victim-1 is incredibly concerning; indeed, the amount of time that defendant dedicated to his harassment campaign is staggering.  After the in-person meeting arranged with the FBI, defendant escalated his conduct to in-person behavior, including sending unwanted packages to Victim-1's residence, driving by the home, and stalking Victim-1 to his place of employment. If not for the intervention of law enforcement, defendant's conduct surely would have continued to escalate.  Indeed, Victim-1 described:

> I believe that the defendant's end goal was to get me to end my life, and I truly felt as low as that point since the defendant first began his abuse towards me.  There were times when a stranger would show up to my home invited by the defendant and I, at the time, verbally stated actions of ending my life on the phone with law enforcement. I feel grateful that I was able to live through those 20 months and that I am still here.  I was and still feel that I am in a constant state of depression and anxiety due to the individual's actions.  I deal with negative thoughts and

14

> flashbacks thinking back to these twenty months. . . . This
> is now something that I will have to carry with me for the
> rest of my life.

Moreover, defendant's harassment and cyberstalking conduct extended beyond simply Victim-1 and encompassed numerous members of his family and employees at the hospital where both defendant and Victim-1 worked. Defendant's harassing messages to Victim-1's family were twisted and disturbing, including sending nude photographs of Victim-1, sending pornographic images, and falsely telling Victim-1's mother that Victim-1 had killed himself.

The seriousness of defendant's crimes warrants a significant sentence at the top of the guidelines.

## II.  **History and Characteristics of Defendant**

The history and characteristics of defendant also indicate that significant sentence is warranted. Although defendant does not have any previous criminal convictions, as described above, defendant has committed similar conduct in the past, including harassing his prior victims in Wisconsin and Cook County. In those instances, he also engaged in long-term harassment, including creating impersonating dating profiles and harassing family members. With respect to the individual in Cook County, defendant's harassment involved a student at the University of Iowa, which led to a partial lock down of the campus. PSR ¶ 48.

The government recognizes that the defendant suffers from mental health issues, including trauma from prior sexual assaults, and the government recognizes

15

that information is potentially mitigating. However, in *United States v. Lee*, 730 F.3d 12 (1st Cir. 2015), the First Circuit affirmed the district court's decision denying defendant's request for a downward departure or variance based on his mental and physical condition in a cyberstalking case. There, the district court "recognized its discretion to depart under those sections, but it declined to do so for reasons that have to do with danger to the victims and the public." *Id.* at 19 (internal brackets and quotations omitted). Indeed, the First Circuit held that despite the "seriousness of his health and mental problems," the choice not to reduce the defendant's sentence "was not an abuse of discretion." *Id.*

Similarly here, the Court should certainly consider defendant's mental health issues, although the government respectfully submits that as in *Lee*, it should still impose a significant sentence due to the "danger to the victims and the public," as well as the terrifying nature of defendant's conduct.

## III. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and To Provide Deterrence

The sentence that this Court imposes should also reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide deterrence. Here, a significant sentence at the top of the guidelines is necessary to provide both general and specific deterrence.

With respect to specific deterrence, defendant has shown that nothing to date has stopped him from stalking individuals in the Midwest. In 2011, Individual-2 in

16

Cook County obtained a no contact order due to defendant's years-long harassment. Nevertheless, defendant violated the order by continuing to contact him and his attorney. In 2017, defendant was arrested in Dane County, Wisconsin for similar conduct, including creating fake accounts at dating websites impersonating Individual-1. That case was ultimately dismissed in 2019 after defendant completed a first offender program. However, within a few years, defendant committed the instant conduct.

After defendant began cyberstalking Victim-1, in July 2022, Victim-1 obtained a no contact order from Cook County Circuit Court. Defendant repeatedly violated that order, resulting in his arrest in DuPage County. PSR ¶ 54. Defendant pled guilty to violating the order of protection, and he was sentenced to one year of court supervision. However, defendant continued to cyberstalk Victim-1. Moreover, defendant's arrest by the FBI and subsequent detention at MCC-Chicago also did not deter defendant's attempts to continue to harass and stalk Victim-1 and others.

In short, a prior state arrest, two prior state court no-contact orders, a conviction in state court, and federal criminal charges did not deter defendant's conduct. Only a significant period of incarceration has any hope of deterring defendant's future conduct, although the government is not optimistic that this will be the last time that defendant engages in similar conduct. Under these circumstances, even assuming a jail sentence would not deter defendant from cyberstalking others in the future, at least a significant period of incarceration would

incapacitate defendant for several years, which would hinder his attempts to cyberstalk during that timeframe.

In terms of general deterrence, data from the Department of Justice's Bureau of Justice Statistics reveal that stalking and cyberstalking affect a significant number of people in the United States. Rachel E. Morgan and Jennifer L. Truman, Stalking Victimization, 2019, U.S. DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS BULLETIN, available at https://bjs.ojp.gov/content/pub/pdf/sv19.pdf (last visited Feb. 27, 2025). In 2019, an estimated 3.4 million U.S. residents 16 or older were victims of stalking, and of those, approximately 936,310 were victims of cyberstalking. *Id.* at 1, 6. Concerningly, only 29% of all stalking victims reported their victimization to the police. *Id.* at 4. One of the most important reasons that stalking was not reported was the feeling that "the victimization was not important enough to report to police." Further, 33% of stalking victims reported that they did not "think the police could do anything to help." *Id.* at 4. A significant sentence of incarceration in this case would send a message to the public that cyberstalking will not be tolerated by the criminal justice system, and could encourage victims to seek the assistance of law enforcement when they are victimized.

## IV.    <u>Other Similar Cyberstalking Sentences</u>

Courts throughout the United States have imposed significant sentences in cyberstalking cases, including sentences of 60 months, which is the statutory

18

maximum. In *United States v. Sayer*, 748 F.3d 425 (1st Cir. 2014), the defendant committed strikingly similar conduct as in the instant case. There, after the victim broke off a romantic relationship with Sayer, he "persistently stalked and harassed [the victim] for over four years." Sayer also used the internet to "induce anonymous third parties to harass [the victim]," by posting online ads in the "casual encounters" section of Craigslist that had photographs of the victim in lingerie and detailed directions to her home. The ads "described a list of sexual acts she was supposedly willing to perform." *Id.* at 428. Sayer's harassment caused the victim to move and obtain a protection order in state court, but Sayer continued to post ads on an "adult pornography site," including videos of the victim and Sayer performing consensual sexual acts taken while they were dating. *Id.* After police executed a search warrant at Sayer's home, he created another fake profile of the victim on MySpace, which included links to adult pornography sites hosting videos of the victim. *Id.* at 429. Sayer pled guilty to one count of cyberstalking, and his advisory guidelines range was 37-46 months. *Id.* at 433.

The district court imposed a sentence of 5 years, which was the statutory maximum. In support of the sentence, the court cited "factors here that the sentencing commission simply has not considered in the guideline analysis," including "the use of anonymous third parties to harass the victim and the extra danger that caused," the "effect of posting on the Internet [the victim's] identity, address, intimate details, all of which, as we know, is permanent," and the "many

19

involvements that this defendant had with law enforcement, which did not deter him until the final arrest." *Id.* at 433. The First Circuit affirmed the statutory maximum sentence, noting that the district court did not abuse its discretion in fashioning a sentence that was "needed to keep [the victim] and the public safe from Sayer, as well as to give Sayer enough time to receive treatment so that he does not repeat his behavior with [the victim] in another relationship." *Id.* at 437; *see also United States v. Lloyd*, 809 Fed. App'x 750, 754 (11th Cir. 2020) (affirming statutory maximum sentence).

Although, of course, each defendant is different, the facts in *Sayer* are strikingly similar to the instant case, including the use of impersonating profiles to send anonymous third parties seeking sex, the non-consensual distribution of nude and semi-nude images of the victim, and the fact that contact with law enforcement did not deter subsequent cyberstalking. A sentence at the top of the guidelines is therefore warranted.

## V. **Supervised Release**

The government agrees with the Probation Office's recommendation to impose a term of supervised release in order to provide additional specific deterrence to the defendant and to assist with his rehabilitation following his custodial term of imprisonment. Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), and because of defendant's history of repeated criminal conduct, the government concurs with Probation's recommendation

that the term of supervised release be three years. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in the defendant's rehabilitation and reintegration into society, the government supports Probation's recommendation that the term of supervised release include the conditions set forth in the PSR. Those conditions include the Computer and Internet Monitoring Program and other special restrictions on usage of computers, which is appropriate here given defendant's usage of electronic devices and the internet to stalk Victim-1.

## RESTITUTION

The government also requests that the Court impose mandatory restitution to Victim-1 in the amount of $21,816.95. Pursuant to 18 U.S.C. § 2264, upon conviction for cyberstalking, restitution to the victim is mandatory, and encompasses the "full amount of the victim's losses," which includes the following categories of losses:

> (A) Medical services relating to physical, psychiatric, or psychological care;
>
> (B) Physical and occupational therapy or rehabilitation;
>
> (C) Necessary transportation, temporary housing, and child care expenses;
>
> (D) Lost income;
>
> (E) Attorneys' fees, plus any costs incurred in obtaining a civil protection order;
>
> (F) Veterinary services relating to physical care for the victim's pet, service animal, emotional support animal, or horse; and

21

(G) Any other losses suffered by the victim as a proximate
     result of the offense.

18 U.S.C. § 2264(b)(3). The government has the burden to establish the amount of the victim's losses by a preponderance of the evidence. *United States v. Cardozo*, 68 F.4th 725, 732 (1st Cir. 2023). However, "[t]hat burden is not a heavy one: as long as the court's order reasonably responds to some reliable evidence, no more is exigible." *Id.*

Here, Victim-1's losses are comprised of the following: (1) $16,962 of lost income; (2) $4,503.77 for damage that defendant caused to Victim-1's vehicle; (3) $151.18 for the purchase of a Blink Doorbell; (4) $100 for a subscription to Blink; and (5) $100 to purchase signs to deter anonymous men from coming to Victim-1's residence. Supporting documentation provided by Victim-1 is attached hereto as Exhibit B.

Specifically, with respect to lost income, Victim-1 lost his job at an employer in Illinois in approximately February 2022 due to defendant's cyberstalking. (Exh. A, at 2 ("I lost one of my jobs in Napeville due to the defendant's harassment, and was also extremely harassed through my other jobs. Not only did I lose one of my jobs, but the time spent dealing with the abuse took away from my ability to be able to work during these 20 months."). Victim-1's W-2 Wage and Tax Statements (Exh. B, at 1-2) revealed that Victim-1 earned $15,764.50 in 2021. For the approximately one month he worked in 2022, he earned $1,542. The aforementioned $16,962 reflects 11 months of lost income at the $1,542 per month rate, as Victim-1 believes that had

22

defendant not cyberstalked Victim-1 he would have worked more hours in 2022 than in 2021. Victim-1 obtained new employment in early 2023.

Defendant also damaged Victim-1's vehicle. Victim-1 obtained an appraisal to repair the damage (Exh. B at 3-8), which estimated the cost at $4,503.77. As a result of defendant sending anonymous men to Victim-1's residence and his family's residence, they obtained a Blink video doorbell as a security measure, which also incurred an annual fee, as well as no-trespassing and other signs. (Exh. A, at 2 ("My family and I myself had to take drastic measures to protect our physical safety, including installing a doorbell system with motion sensors, posting police ordered no-trespassing signs, and barricading our home.").) The receipt for purchase of the doorbell and the annual subscription fee are also attached. (Exh. B at 9-10.) Although Victim-1 does not have a receipt for the signs, he estimates the cost at approximately $100.

The attached documentation and Victim-1's victim impact statement provides more than a sufficient basis to order that defendant pay Victim-1 $21,816.95 in restitution.

23

## CONCLUSION

For the reasons stated here, the government respectfully requests that this Court impose a sentence of 51 months' imprisonment followed by 3 years of supervised release, and restitution in the amount of $21,816.95.

Dated: February 27, 2025        Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:    *s/ Jonathan L. Shih*
    JONATHAN L. SHIH
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5361
jonathan.shih@usdoj.gov

24